# UNITED STATES DISTRICT COURT

for the

District of Oregon

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The Subject Premises located at 20642 SW Sunde Ct,<br>Tualatin, OR 97062, and the person of Michael Miglavs,<br>more fully described in Attachment A | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No.   3:23-mc-356 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

The Subject Premises located at 20642 SW Sunde Ct, Tualatin, OR 97062, and the person of Michael Miglavs, more fully described in Attachment A.

located in the _____ District of _____ Oregon _____ , there is now concealed *(identify the person or describe the property to be seized)*:

The information and items set forth in Attachment B hereto.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1470 | Transfer of Obscene Matter to a Minor |
| 18 U.S.C § 2251(a) | Sexual Exploitation of Children |
| 18 U.S.C § 2422(b) | Coercion and Enticement of a Minor |

The application is based on these facts:

See the attached affidavit of HSI Special Agent Clinton Lindsly.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Clinton Lindsly, Special Agent, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ Telephone at 11:06 a.m./p.m. _____ *(specify reliable electronic means)*.

Date:   4/27/2023        _____
*Judge's signature*

City and state:   Portland, Oregon      Honorable Stacie F. Beckerman, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Description of the Premises, Property, or Person to be Searched

**1.      Subject Premises:  20642 SW Sunde Ct, Tualatin, OR 97062**

The **Subject Premises** is described as a residence that is at the end of the cul-de-sac on SW Sunde Ct.  The residence is on the north side and is brown with white trim.  The numbers "20642" can be seen on the west side of the front door in white lettering.  The front door to the **Subject Premises** faces south towards Sunde Ct.  It is believed that it is likely that **MIGLAVS** resides with roommates.  As such and as further described in Attachment A, the **Subject Premises** includes **MIGLAVS'** bedroom, storage areas to which he has access, and any shared common areas in the residence to which **MIGLAVS** has access.



**2.       Person to be Searched:  Michael Ryan MIGLAVS**

**MIGLAVS** is a white male, approximately 5'6" tall and weighing140 pounds, with date of birth XX/XX/2000 and Oregon driver's license #XXXX962; pictured below.



The search of **MIGLAVS** shall include **MIGLAVS'** person, clothing, and personal belongings, including backpacks, briefcases, and bags that are within his immediate vicinity and control, and any cell phone or digital device found on his person or in any of the foregoing containers, that may contain the items subject to seizure and search under Attachment B to this warrant.

**ATTACHMENT B**

**Items to be Searched For, Seized, and Examined**

The following items, documents, and records that contain contraband or are evidence, fruits, or instrumentalities of violations of *18 U.S.C. § 1470* – Transfer of Obscene Material to a Minor, *18 U.S.C § 2251(a)* – Sexual Exploitation of Children, and *18 U.S.C § 2422(b)* – Coercion and Enticement of a Minor (the "**Target Offenses**"):

**I.    Digital Evidence**

1.    Any mobile devices including cell phones that may have been used to commit or facilitate the **Target Offenses**.

2.    Any computers that may have been used to commit or facilitate violations of the **Target Offenses**, including any peripheral devices such as external hard drives, external disk drives, power supplies, modem, and routers.

3.    Any computer equipment or digital devices that are capable of being used to create, access, or store contraband or evidence, fruits, or instrumentalities of the **Target Offenses**, including gaming consoles (e.g., an Xbox), central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices including paging devices and cellular telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communication devices such as modems, routers, cables, and connections; storage media; and security devices.

4.    Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are

capable of being used to commit or further the crimes referenced above, or to create, access, process, or store contraband or evidence, fruits, or instrumentalities of such crimes.

5.      Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, thumb drives, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes referenced above, or to create, access, or store contraband, or evidence, fruits, or instrumentalities of such crimes.

6.      Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software.

7.      Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched.

8.      Any physical keys, encryption devices, dongles, or similar physical items which are necessary to gain access to the computer equipment, storage devices, or data.

9.      Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, digital devices, storage devices, cloud-based storage accounts, or data.

10.      All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) of the computers or digital devices during the time the device was used to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked or favorite web pages; email addresses used from the computer; MAC IDs and/or

**Attachment B**                                                                                           **Page 2**

Internet Protocol addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; screen names or usernames, and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious software.

## II.    Records, Documents, and Visual Depictions

11.    Any records, documents, or materials, including correspondence, that pertain to any account, record, data, or file related to Snapchat, MEGA, any other social media application or cloud-based storage, any email address or phone number identified in the supporting affidavit, and any payment records related to MEGA or any other business that can facilitate the **Target Offenses**.

12.    Any records, documents, or materials, including account login information and/or passcodes related to Snapchat, MEGA, any other social media application or cloud-based storage, and or any identified email address in the supporting affidavit.

13.    Any records, documents, or materials, including GPS location data, messages, calendar schedules, work schedule, and other data, that would identify the location of the digital device or the user of the digital device at a specific moment in time (for the purposes of comparing it to the IP logs on the Snapchat account, MEGA account, email accounts, etc.).

14.    Any records, documents, or materials, including any IP logs, from any digital device including a router.

15.    Any records, documents, or materials, including correspondence, that pertain to the production, transportation, distribution, receipt, or possession of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

16.    All originals and copies (physical or digital) of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

**Attachment B**                                                                                               **Page 3**

17.    Any motion pictures or digital video clips of visual depictions of minors engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256; video recordings which are self-produced and pertain to sexually explicit images of minors; or video recordings of minors which may assist in the location of minor victims of child exploitation or child abuse.

18.    Any records, documents, or materials which include offers to transmit, through interstate commerce by any means (including by computer), any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

19.    Any records, documents, or materials relating to the production, reproduction, receipt, shipment, trade, purchase, or a transaction of any kind involving the transmission, through interstate commerce (including by computer), of any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

20.    Any records, documents, or materials naming or identifying minors visually depicted while engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

21.    Any images or videos that depict **MIGLAVS** engaged in sexually explicit conduct, as well as any evidence that he transmitted or sent those images or videos to any minor.

22.    Any records of Internet usage, including records containing screen names, usernames, and e-mail addresses, and identities assumed for the purposes of communication on the Internet. These records include billing and subscriber records, chat room logs, e-mail messages, and include electronic files in a computer and on other data storage media, including CDs or DVDs.

23.    Any records, documents, or materials referring or pertaining to communications with others, whether in person, by telephone, or online, for the purpose of producing, distributing,

**Attachment B**                                                                                            **Page 4**

transporting, or receiving child pornography, including chat logs, call logs, address book or contact list entries, and digital images or videos sent or received.

24.     Any records, documents, or materials, including correspondence, that could assist in identifying the user of a particular cell phone, computer, or other digital device at a specific moment in time.

25.     Information or evidence of any websites visited, photographs, videos, images, reports, definitions, stories, books, music, lyrics, emails, videos, messages, and or notes associated with child pornography or those who collect, disseminate, or trade in child pornography.

As used above, the terms "records," "documents," "programs," "applications," or "materials" include records, documents, programs, applications or materials created, modified or stored in any form including digital or electronic form.

## III.    Unlocking Devices Using Biometric Authentication

26.     If any device subject to seizure under the warrant and this attachment is equipped with biometric unlock features, such as fingerprint or facial recognition, investigators may press the fingers of **Michael Ryan MIGLAVS** to any device's fingerprint sensor, or hold the device up to **MIGLAVS'** face, in an attempt to unlock the device for the purpose of conducting the search authorized by the warrant.  Attempting to unlock the relevant device(s) via biometric authentication is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of conducting the search authorized by this warrant.

## Search Procedure

27.     In searching for data capable of being read, stored, or interpreted by a computer or storage device, law enforcement personnel executing the search warrant will employ the following procedure:

**Attachment B**                                                                                    **Page 5**

a.    *On-site search, if practicable.*  Law enforcement officers trained in computer forensics (hereafter, "computer personnel"), if present, may be able to determine if digital devices can be searched on site in a reasonable amount of time without jeopardizing the ability to preserve data on the devices.  Any device searched on site will be seized only if it contains data falling within the list of items to be seized as set forth in the warrant and herein.

b.    *On-site imaging, if practicable.*  If a digital device cannot be searched on site as described above, the computer personnel, if present, will determine whether the device can be imaged on site in a reasonable amount of time without jeopardizing the ability to preserve the data.

c.    *Seizure of digital devices for off-site imaging and search.*  If no computer personnel are present at the execution of the search warrant, or if they determine that a digital device cannot be searched or imaged on site in a reasonable amount of time and without jeopardizing the ability to preserve data, the digital device will be seized and transported to an appropriate law enforcement laboratory for review.

d.    Law enforcement personnel will examine the digital device to extract and seize any data that falls within the list of items to be seized as set forth in the warrant and herein.  To the extent they discover data that falls outside the scope of the warrant that they believe should be seized (e.g., contraband or evidence of other crimes), they will seek an additional warrant.

e.    Law enforcement personnel will use procedures designed to identify items to be seized under the warrant.  These procedures may include the use of a "hash value" library to exclude normal operating system files that do not need to be searched.  In addition, law enforcement personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data falls within the list of items to be seized under the warrant.

**Attachment B**                                                                                 **Page 6**

f.      If the digital device was seized or imaged, law enforcement personnel will perform an initial search of the original digital device or image within a reasonable amount of time not to exceed 120 days from the date the warrant is executed.  If, after conducting the initial search, law enforcement personnel determine that an original digital device contains any data falling within the list of items to be seized pursuant to this warrant, the government will retain the original digital device to, among other things, litigate the admissibility/authenticity of the seized items at trial, ensure the integrity of the copies, ensure the adequacy of chain of custody, and resolve any issues regarding contamination of the evidence.  If the government needs additional time to determine whether an original digital device or image contains any data falling within the list of items to be seized pursuant to this warrant, it may seek an extension of time from the Court within the original 120-day period from the date the warrant is executed.  The government shall complete the search of the digital device or image within 180 days of the date the warrant is executed.  If the government needs additional time to complete the search, it may seek an extension of time from the Court.

g.      If, at the conclusion of the search, law enforcement personnel determine that particular files or file folders on an original digital device or image do not contain any data falling within the list of items to be seized pursuant to the warrant, they will not search or examine those files or folders further without authorization from the Court.  Law enforcement personnel may continue to examine files or data falling within the list of items to be seized pursuant to the warrant, as well as data within the operating system, file system, or software application relating or pertaining to files or data falling within the list of items to be seized pursuant to the warrant (such as log files, registry data, and the like), through the conclusion of the case.

h.      If an original digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will return that original data device to its

**Attachment B**                                                                                  **Page 7**

owner within a reasonable time following the search of that original data device and will seal any image of the device, absent further authorization from the Court.

STATE OF OREGON                )
                              )  ss.        AFFIDAVIT OF CLINTON B. LINDSLY
COUNTY OF MULTNOMAH           )

**Affidavit in Support of an Application for a Search Warrant**

I, Clinton B. Lindsly, being duly sworn, depose and state as follows:

**Introduction and Agent Background**

1.      I have been employed as a Special Agent (SA) by the U.S. Department of

Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations

(HSI) since August 2010.  I am currently assigned to the child exploitation unit in the HSI office

in Portland, Oregon.  Previously, I was assigned to the HSI office in Los Angeles, California,

where I worked for over six years in a money laundering and narcotics group that specialized in

undercover operations.  In 2018, I transferred to HSI Portland and continued to specialize in

money laundering and narcotics investigations until January 2020.  My formal law enforcement

training includes successfully completing the 23-week HSI basic training course at the Federal

Law Enforcement Training Center in Glynco, Georgia.  During that training, I learned how to

conduct child exploitation investigations.  Since then, I have been involved in many child

exploitation investigations and have assisted federal and state partners during their

investigations.  As such, I have become familiar with ways that child pornography is shared,

distributed, and/or produced, including the use of various social media websites (Facebook,

Twitter, Kik, Snap Chat, Discord, Instagram, etc.), "cloud" based storage, and peer-to-peer (P2P)

networks.  Often, individuals involved in child exploitation will collect or store images and/or

videos on various media devices they keep at their residences, or in offsite locations such as

"cloud" based storage.  I have also become familiar with jargon or slang terms that people

**Page 1 – Affidavit of Clinton B. Lindsly**

involved in child exploitation will use to discuss their activities. Additionally, I have become familiar with how child pornography is sold, traded, and distributed on the "dark net," often being purchased with digital currency such as Bitcoin, Ripple, and others.

2. I have worked with agents involved in numerous investigations involving the sexual exploitation of children or the distribution, receipt, and possession of child pornography. I have participated in searches of premises and assisted in gathering evidence pursuant to search warrants, including search warrants in multiple child pornography investigations. I have participated in interviews of persons who possess and distribute child pornography.

3. I have participated in online undercover communications using messaging platforms with hundreds of people interested in the production, distribution, and receipt of child pornography. In my undercover role I have assisted in the administration of private chat groups dedicated to the production, distribution, and receipt of child pornography. As such, I have become familiar with platforms used to facilitate the production, distribution, and receipt of child pornography and their purposes.

4. I submit this affidavit in support of an application for search warrants authorizing searches of the following:

  a. the person of **Michael Ryan MIGLAVS**, including any digital devices found on **MIGLAVS'** person such as the **Subject Cell Phone**, an **iPhone XR**, and/or an **iPhone 11**; and

  b. **Subject Premises**: **MIGLAVS'** bedroom, storage areas, and any shared common areas in the residence located at 20642 SW Sunde Ct, Tualatin, OR 97062;

as described in Attachment A, for contraband and evidence, fruits, and instrumentalities of violations of *18 U.S.C. § 1470* – Transfer of Obscene Material to a Minor, *18 U.S.C § 2251(a) –*

**Page 2 – Affidavit of Clinton B. Lindsly**

Sexual Exploitation of Children, and *18 U.S.C § 2422(b)* – Coercion and Enticement of a Minor,

collectively referred to as the "**Target Offenses**," as described in Attachment B.

5.      This affidavit is intended to show only that there is sufficient probable cause for

the requested warrant and does not set forth all my knowledge about this matter.  The facts set

forth in this affidavit are based on my own personal knowledge, knowledge obtained from other

individuals during my participation in this investigation, including other law enforcement

officers, interviews of witnesses, a review of records related to this investigation,

communications with others who have knowledge of the events and circumstances described

herein, and information gained through my training and experience.

## Applicable Law

6.      *Title 18, United States Code § 1470* makes it a crime for any person, using the

mail or any facility or means of interstate or foreign commerce, to knowingly transfer obscene

matter to another individual who has not attained the age of 16 years, knowing that such other

individual has not attained the age of 16 years, or to attempt to do so.

7.      *Title 18, United States Code, § 2251(a)* makes it a crime for any person to

employ, use, persuade, induce, entice, or coerce any minor to engage in any sexually explicit

conduct for the purpose of producing any visual depiction of such conduct or for the purpose of

transmitting a live visual depiction of such conduct, if such person knows or has reason to know

that the visual depiction will be transported or transmitted using any means or facility of

interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if the

visual depiction was produced or transmitted using materials that have been mailed, shipped, or

transported in or affecting interstate or foreign commerce by any means, including by computer,

**Page 3 – Affidavit of Clinton B. Lindsly**

or if the visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.

8.      *Title 18, United States Code, § 2422(b)* makes it a crime for any person to use the mail or any facility or means of interstate or foreign commerce to knowingly persuade, induce, entice, or coerce any individual who has not attained the age of 18 years to engage in any sexual activity for which any person can be charged with a criminal offense, or to attempt to do so.

9.      "Child pornography," as defined in 18 U.S.C. § 2256(8), includes any visual depiction of a child under the age of 18 years engaging in sexually explicit conduct.  "Sexually explicit conduct" is defined in 18 U.S.C. § 2256(2) and includes sexual intercourse, whether genital-genital, oral-genital, anal-genital, or oral-anal, whether between members of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; and the lascivious exhibition of the genitals, anus, or pubic area of any person.

## Background on Computers and Child Pornography

10.      Based on my knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, I know that computers, computer technology, and the Internet have drastically changed how child pornography is produced and distributed.

11.      Computers serve four basic functions in connection with child pornography: production, communication, distribution, and storage.

12.      Child pornographers can upload images or video clips directly from a digital camera to a computer.  Once uploaded, they can easily be edited, manipulated, copied, and distributed.  Paper photographs can be transferred to a computer-readable format and uploaded to a computer using a scanner.  Once uploaded, they too can easily be edited, manipulated, copied,

and distributed.  A modem allows any computer to connect to another computer via a telephone, cable, or wireless connection.  Through the Internet, electronic contact can be made to literally millions of computers around the world.

13.    The computer's ability to store images in digital form makes it an ideal repository for child pornography.  The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously in the last several years.  These drives can store thousands of images at very high resolution.  Images and videos of child pornography can also be stored on removable data storage media, such as external hard drives, thumb drives, media cards, and the like, many of which are small and highly portable and easily concealed, including on someone's person or inside their vehicle.

14.    The Internet affords collectors of child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion, including Internet Relay Chat, instant messaging programs such as Kik, bulletin board services, e-mail, and "peer-to-peer" (P2P) file sharing programs such as LimeWire and eMule, and networks such as eDonkey, Gnutella, ARES, Tumblr, and BitTorrent, among others.  Collectors and distributors of child pornography sometimes also use online resources such as "cloud" storage services to store and retrieve child pornography.  Such online services allow a user to set up an account with a remote computing service that provides e mail services as well as electronic storage of computer files in a variety of formats.  A user can set up an online storage account from any computer with access to the Internet and can access stored files using any device capable of connecting to the Internet.  Evidence of such online storage of child pornography is often found on the user's computer.

**Page 5 – Affidavit of Clinton B. Lindsly**

15. An Internet Protocol (IP) address is a unique identifier that electronic devices such as computers, routers, Internet fax machines, printers, and the like use to identify and communicate with each other over a network. An IP address can be thought of as a street address. Just as a street address identifies a particular building, an IP address identifies a particular Internet or network access device. When a user logs on to his/her Internet Service Provider (ISP), they are assigned an IP address for the purpose of communication over the network. An IP address can be statically assigned, meaning the IP address does not change from one Internet session to another, or dynamically assigned, meaning a user receives a different IP address each time the user accesses the Internet. An IP address can only be assigned to one user at a time, and ISPs keep records of who IP addresses are assigned to by date and time. Similarly, cell phone service providers also generally keep IP records that can identify what device (cell phone) utilized the IP address on a certain date and time.

16. As with most digital technology, communications made from a computer are often saved or stored on that computer. Storing this information can be intentional, for example, by saving an e mail as a file on the computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication may be automatically stored in many places, such as temporary files or ISP client software, among others. In addition to electronic communications, a computer user's Internet activities generally leave traces in the computer's web cache and Internet history files. A forensic examiner often can recover evidence that shows whether a computer contains P2P software, when the computer was sharing files, and some of the files that were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

**Page 6 – Affidavit of Clinton B. Lindsly**

17.     I know, based on my training and experience, and based on conversations I have had with others who investigate child exploitation offenses, that people who have a sexual interest in children, including persons who collect and trade in child pornography, often receive sexual gratification from images and video clips depicting the sexual exploitation of children. They may also use such images and videos to lower the inhibitions of children who they wish to sexually abuse.  Such persons maintain their collections of child pornography in safe, secure, and private locations, such as their residence or vehicle, and on computers and digital storage media under their direct control.  Such persons often maintain their collections, which are considered prized possessions, for long periods of time, and prefer not to be without their collections for any prolonged period.  In some recent cases, however, some persons with a sexual interest in children have been found to download and delete child pornography on a cyclical and repetitive basis, rather than storing a collection of child pornography indefinitely.

18.     I also know from my training and experience that many people who download child pornography from the Internet, and those who collect child pornography, frequently save images and videos of child pornography on their computers and/or transfer copies to other computers and storage media, including cloud storage accounts, external hard drives, thumb drives, flash drives, SD cards, and CDs or DVDs.  Moreover, it is common in child pornography investigations to find child pornography on multiple devices and/or storage media located in suspects' homes, rather than on a single device.

19.     I know based on my training and experience that many social media applications, such as Facebook, Instagram, Twitter, Snap Chat, Kik messenger, and others can be directly accessed and used with one's cellular phone.  Often, these applications require the user to

**Page 7 – Affidavit of Clinton B. Lindsly**

download the application directly to their phone, which then allows seamless use between the cellular phone and the social media website.

### Information Regarding Snapchat

20.     Snapchat is one of the most popular applications for sending and receiving "self-destructing" messages, pictures, and videos.  Referred to as "snaps," the company processes approximately 700 million messages every day on Apple's iOS and Google's Android operating systems.  Snapchat users access the application frequently.  According to marketing material provided by the company, the average Snapchat user checks their account 14 times a day.  Snapchat also offers several other features including "Our Stories," "Story," messaging, and Snapcash.

21.     A "snap" is a picture or video message taken and shared with other Snapchat users in real time.  The sender of a snap has the option of setting a timer for how long a snap can be viewed.  Once a snap has been viewed it is deleted from the company's system and is no longer visible to the recipient unless the recipient takes steps to record it while viewing it.  Snapchat users can send text messages to others using the Chat feature.  Once a user leaves the Chat screen, messages viewed by both the sender and the receiver will no longer be visible.  The application notifies other users when they are online so they can begin messaging each other.  In addition, Snapchat users can send pictures to other users by utilizing the camera on their device.  Pictures can also be sent from the saved pictures in the photo gallery of the device.  "Snaps" constitute "electronic communications" within the meaning of 18 U.S.C. § 3123.  *See* 18 U.S.C. §§ 3127(1) and 2510(12).

22.     When a user creates an account, they choose a unique Snapchat username.  This is the name that is visible to other Snapchat users.  An e-mail address is required to register a

**Page 8 – Affidavit of Clinton B. Lindsly**

Snapchat account.  A new user is asked to also provide a mobile phone number.  The e-mail address or phone number is verified during the registration process.

<u>**Statement of Probable Cause**</u>

*Sherwood Police Department Contacts HSI for Assistance*

23.    In April 2023, I was contacted by the Sherwood Police Department (SPD) to request assistance in an investigation involving **Michael Ryan MIGLAVS**.  SPD had been investigating **MIGLAVS's**  online activity involving the use of Snapchat, Xbox, and other social media accounts to meet and lure at least two minor female victims to produce sexually explicit content since at least 2021.  During these online conversations with the minors, **MIGLAVS** sent sexually explicit content of himself (i.e., masturbating, penis pictures, etc.) to the minor females who were under the age of 16.  Additionally, **MIGLAVS** and the minors would masturbate with each other over live video streaming.

24.    Based on my review of documents and interviews obtained in this investigation, it appeared that **MIGLAVS** and each minor believed that they were in an online romantic relationship with each other.  **MIGLAVS** would originally misrepresent his age to be much younger and then eventually tell the minor victims his true age.  **MIGLAVS** is currently a 22-year-old male who is believed to reside at 20642 SW Sunde Ct, Tualatin, OR 97062 (the **Subject Premises**).

*Minor Victim-1 Comes Forward to Police*

25.    In December 2021, an 18-year-old female ("Minor Victim-1," or MV-1) called SPD to report that she had been involved in a sexual relationship with **MIGLAVS**.[1]  MV-1

---

[1] It appears that MV-1 is motivated to report this activity to law enforcement because she now sees herself as having been sexually exploited by **MIGLAVS**.  I believe information provided by

**Page 9 – Affidavit of Clinton B. Lindsly**

stated that she had been in a sexual relationship with **MIGLAVS** starting when she was about 16

and continuing until she was 18. During this time, **MIGLAVS** was approximately 19 to 21 years

old. This relationship was consensual in the sense that both parties were willing participants,

although MV-1 later claimed that **MIGLAVS** was "violent" towards her. MV-1 stated that they

broke up in the middle of 2021, but she recently found out that **MIGLAVS** appeared to be

having relationships with other underage girls online. MV-1 stated that she became aware of this

after someone sent her screenshots on Snapchat showing **MIGLAVS** communicating with

underage girls. MV-1 then logged into **MIGLAVS's** Snapchat account and observed messages

between **MIGLAVS** a minor female that she suspected to be 14 years old ("Minor Victim-2," or

MV-2). MV-1 screen recorded this conversation and provided it to police. I have reviewed this

conversation. These messages included what appeared to be a screen recording of a chat

conversation between a username that was a part of MV-2's name and another individual,

presumably **MIGLAVS**. These messages were time stamped with dates in the beginning of

December 2021. The focus of the conversation appeared to be MV-2 and **MIGLAVS** "breaking

up" and saying goodbye to each other. In one message, **MIGLAVS** said "I really hope you need

[meet] a good guy ur age, I want you to be happy baby girl," "This is just the right thing to do,"

"It's just your age," and "If I have to wait just three years to spend the rest of my life with you

I'm gonna do it."

      26. Prior to reporting this information to SPD, MV-1 contacted MV-2 via Snapchat

and text message. MV-1 and MV-2 discussed MV-2's relationship with **MIGLAVS**. MV-2

---

MV-1 to be reliable and truthful to the extent that it has been independently corroborated by this
investigation.

**Page 10 – Affidavit of Clinton B. Lindsly**

agreed to send screenshots of her remaining text messages with **MIGLAVS** to MV-1, which MV-1 then provided to SPD. MV-2 was reluctant to provide any further identifying information to MV-1 as she did not want her parents to find out what was going on. MV-2 told MV-1 that she sent **MIGLAVS** nude photographs and videos of herself and that **MIGLAVS** saved them. MV-2's father subsequently contacted SPD and MV-2 was interviewed, which is further discussed below. MV-2 resides in Washington state.

27.    After MV-1 reported this information to SPD, **MIGLAVS** allegedly sent threatening messages to MV-1's boyfriend via TikTok warning MV-1 and her boyfriend that he (**MIGLAVS**) knew their location and suggested they watch out for their cars (i.e., **MIGLAVS** was going to damage their cars).

28.    In December 2022, MV-1 again called SPD to report that she believed that **MIGLAVS** was involved in another relationship with an underage girl, who was approximately 14 years old ("Minor Victim-3," or MV-3). MV-1 based that belief on her review of **MIGLAVS**'s social media posts. MV-1 claimed that she attempted to contact MV-3's parents but had not heard back yet. SPD subsequently contacted MV-3's mother and conducted an interview of MV-3, which is further discussed below. MV-3 resides in Washington state and was 15 years old.

29.    MV-1 stated that **MIGLAVS'** phone number is 971-380-0515 (the **Subject Cell Phone**) and that she believed **MIGLAVS** resided at an apartment located at 21767 SW Cedar Brook Way Apt. 244, Sherwood, Oregon 97140 (**MIGLAVS'** former residence). MV-1 also reported that she believed **MIGLAVS'** worked at Western States Arboriculture, LLC. A Google search revealed that their place of business is located at 10290 SW Tualatin Rd, Tualatin, OR 97062 (**MIGLAVS'** employer).

Page 11 – Affidavit of Clinton B. Lindsly

30.     However, as further discussed below court authorized GPS location data and physical surveillance confirmed that **MIGLAVS** now resides at the **Subject Premises**. Based on IP access logs to various email accounts, investigators believe that **MIGLAVS** moved from his former residence to the **Subject Premises** in approximately March 2023.

31.     According to subpoenaed records from Cellco DBA Verizon Wireless, there is no subscriber record for the **Subject Cell Phone** (i.e., records say "TRACPHONE") but the associated device is an **iPhone 11**, which was activated on October 21, 2022, and has assigned IMSI 311480608764881. Additionally, it appears that the previous phone associated with the **Subject Cell Phone** was an **iPhone XR** and had assigned IMSI 311480767005852. As further discussed below, these devices are also consistent with the phones used to access **MIGLAVS's** Snapchat and/or Mega accounts.

*Minor Victim-2*

32.     In January 2022, SPD received a call from MV-2's father. During the phone call, SPD detectives learned that someone (presumably MV-1) contacted him through Instagram and told him that one of his daughters was talking with an older guy online. The father then confronted MV-2 about the allegation. MV-2 confirmed that it was true and said that she met "Michael" (**MIGLAVS**) while playing Xbox online. The father confirmed that MV-2 was only 14 years old, and that "Michael" originally told MV-2 that he was 16 years old. The father went on to explain that at some point "Michael" told MV-2 that he was in fact 21 years old. MV-2 told the father that "Michael" had sent nude photographs to her and that she (MV-2) had sent nude photographs to "Michael." MV-2 originally claimed that "Michael" tried to get her to have phone sex with him, but she chose not to participate. The father confirmed that MV-2 resided in Washington state.

Page 12 – Affidavit of Clinton B. Lindsly

33.    In February 2023, SPD detectives interviewed MV-2.  MV-2 told them that she first started speaking with **MIGLAVS** over Snapchat and told him she was 14 years old. **MIGLAVS** originally claimed to be 17 years old and later told her he was in fact 21 years old. MV-2 stated that she communicated with **MIGLAVS** from approximately October 2021 through January 2022.  She communicated with **MIGLAVS** using Snapchat, Instagram, Minecraft, and by phone and text.

34.    When MV-2 learned **MIGLAVS** was 21, she stopped speaking with him for several days, but **MIGLAVS** kept messaging her.  MV-2 then resumed communicating with him, and **MIGLAVS** started to ask her for "explicit pictures of [her], like naked."  MV-2 stated that she originally told **MIGLAVS** that she was not going to send him nude pictures and because of that he berated her.  She eventually gave in and started to send **MIGLAVS** "nude photos." After she sent him the nude photos, **MIGLAVS** asked MV-2 for additional videos and "phone sex."  MV-2 was then contacted by MV-1, who told MV-2 about **MIGLAVS** targeting young girls.  MV-2 then blocked **MIGLAVS** on social media.  After MV-2 blocked him, **MIGLAVS** contacted MV-2 from various phone numbers and sent her insulting text messages.

35.    MV-2 stated that **MIGLAVS** sent her pictures and videos of his penis and said that he would "touch himself."  MV-2 stated that she "gave in and did what he wanted" and sent him sexually explicit images and videos of herself.  MV-2 also stated that she engaged in sexually explicit FaceTime conversations (i.e., live video chats) with **MIGLAVS**.  MV-2 added that he would get upset if she did not compliment his penis during the video calls.

36.    When asked about the sexually explicit images and videos, MV-2 stated that **MIGLAVS** asked her to send him pictures of her "boobs," "vagina," and videos of her "touching [herself] down there."  MV-2 stated that **MIGLAVS** would send her videos of him "touching

**Page 13 – Affidavit of Clinton B. Lindsly**

himself." MV-2 stated that **MIGLAVS** directed her on what kind of sexually explicit videos to make. MV-2 provided the following example: "I want a video of you touching yourself, take your panties off." When asked for more clarification about the videos, MV-2 stated that **MIGLAVS** would have her rub her vagina and ask her to put her fingers inside her vagina. MV-2 stated that she sent at least three sexually explicit videos and "a lot" of pictures to **MIGLAVS**. MV-2 stated that she felt pressured by **MIGLAVS**.\

37.    In April 2023, MV-2 reported to law enforcement that she believed **MIGLAVS** may have moved to a new unknown residence. After learning this information, investigators subsequently identified **MIGLAVS'** new residence as the **Subject Premises**.

*Minor Victim-3*

38.    On January 31, 2023, SPD detectives interviewed MV-3. In summary, MV-3 stated that she originally met "Michael" (**MIGLAVS**) on Snapchat after a "quick add" in January 2022. MV-3 told **MIGLAVS** that she was 15 years old. MV-3 stated that they talked online for approximately two months and then stopped communicating because **MIGLAVS** "realized it was wrong." Then in around September 2022, **MIGLAVS** and MV-3 resumed communications online and via text message. MV-3 stated that she was in a "relationship" with **MIGLAVS** and that he wanted to meet up in person. MV-3 stated she sent nude photos and videos of herself to **MIGLAVS** and **MIGLAVS** also sent nude photos and videos of himself to her. MV-3 stated that most of the "inappropriate" messages were sent via Snapchat. When asked if she masturbated in any of the videos sent to **MIGLAVS**, MV-3 confirmed that she did. MV-3 confirmed that she sent masturbation videos during both time periods that they were communicating (i.e., the beginning and end of 2022). MV-3 stated that she ended the relationship with **MIGLAVS** in the beginning of January 2023.

**Page 14 – Affidavit of Clinton B. Lindsly**

39.     After "blocking" **MIGLAVS** on various social media accounts, **MIGLAVS**
continued to attempt to contact MV-3 by using various random phone numbers.  MV-3 explicitly
told **MIGLAVS** several times that she was underage and to stop contacting her.  **MIGLAVS**
also sent several text messages to MV-3 throughout January berating her, which caused MV-3
significant emotional stress.  This conduct was remarkably similar to what **MIGLAVS** did with
MV-2.  One of the text messages insinuated that MV-3 had produced a sexually explicit video as
follows:

> "Imagine being such a fucking slut.  I saw your fingering videos and heard you
> do that for everybody can we Facetime please? I have a big dick.  Please I'll
> Venmo money."

40.     MV-3 gave investigators consent to manually review her cell phone.  During the
review, investigators observed numerous messages between MV-3 and **MIGLAVS** on various
social media applications including Xbox, text message, Snapchat, and Instagram.  Investigators
also observed many pictures of a male that they recognized as **MIGLAVS** saved in MV-3's
photos.  However, investigators located no nude photographs of MV-3 or **MIGLAVS**.

41.     After reviewing MV-3's cell phone, MV-3's mother told investigators that she
was contacted by somebody who informed her that they had seen naked photographs of MV-3.
MV-3 stated that she only sent nude photographs of herself to **MIGLAVS**.  In other words, it
appeared that MV-3 sent nude photographs to **MIGLAVS** and then **MIGLAVS** shared them
with other people.  MV-3 stated that she has since been contacted by other people asking her for
nude photographs.  MV-3 stated that **MIGLAVS** used the following social media usernames:
"miglavs" (Snapchat), "B3ASTG2" (Xbox), and "m1glavs" (Instagram).

42.     In March 2023, MV-3 agreed to place a recorded call to **MIGLAVS** to further the
investigation.  During the call and when asked, **MIGLAVS** denied sharing her "nudes" and

claimed that he did not have any. Eventually MV-3 told investigators that she did not feel

comfortable communicating with **MIGLAVS** anymore.

*SPD Obtains State Search Warrant for Various Snapchat Accounts*

43.    In March 2023, SPD detectives obtained a state search warrant for subscriber

records, IP logs, media files, message content, and other data from Snapchat for various accounts

used by MV-2, MV-3, and **MIGLAVS**. This warrant was subsequently served on Snapchat.

44.    In April 2023, Snapchat produced responsive records to SPD, who then provided

them to me for review. During my review of these records, I learned that **MIGLAVS** had

created his Snapchat account "miglavs" on January 23, 2022, with a reported email address of

michaelmiglavs@gmail.com, and a verified phone number of 971-380-0515 (**Subject Cell**

**Phone**). When **MIGLAVS** created the Snapchat account he accurately reported his date of birth

as xx/xx/2000. Then on November 9, 2022, **MIGLAVS** changed his reported date of birth from

2000 to 2005, essentially making himself 17 years old.

45.    During a review of IP logs and related device information, I observed that

**MIGLAVS** used at least two different cell phones to access his Snapchat account -- an **Apple**

**iPhone XR** and an **Apple iPhone 11**. As described above, the **Subject Cell Phone** is an **iPhone**

**11** and his old phone is an **Apple iPhone XR**. This was further confirmed when **MIGLAVS**

sent MV-2 a message on December 18, 2022, that read "Me other phone ded." Also, on

December 2, 2022, **MIGLAVS** told MV-2 that he would "use [his] other phone tonight."

46.    I also observed that **MIGLAVS** accessed his Snapchat account regularly from IP

address 24.21.174.216 from at least August 3, 2022, to January 29, 2023. Pursuant to an

administrative subpoena to Comcast, I learned that this IP address is subscribed to "Robert

**Page 16 – Affidavit of Clinton B. Lindsly**

Maass" at **MIGLAVS'** former residence.  I believe that "Robert Maass" was likely a roommate at MIGLAVS' former residence.

47.     Snapchat also provided GPS location data related to **MIGLAVS**'s Snapchat account between August 5, 2022, and January 31, 2023.  Between January 3 – 31, 2023, **MIGLAVS** appeared to primarily be located at or near **MIGLAVS'** former residence during evening and morning hours, consistent with residing there during that time.

48.     During a general review of **MIGLAVS'** Snapchat messages, I observed multiple instances where **MIGLAVS** asked other Snapchat users their age, to which some responded 14, 15, 16, 17, etc.  When these individuals then asked **MIGLAVS** how old he was, he would direct them to look at his "public profile," tell them he was 21, or even misrepresent his age.  Even when some of them told him that they were too young, **MIGLAVS** would ask them for a picture or tell them that there was nothing wrong with just chatting.  I counted at least seven different Snapchat accounts that told **MIGLAVS** they were 13, seven accounts that told **MIGLAVS** they were 14, eight accounts that told **MIGLAVS** they were 15, seven different accounts that told **MIGLAVS** they were 16, and three different accounts that told **MIGLAVS** they were 17.  This is consistent with **MIGLAVS** specifically targeting minors online.

49.     During my review of these records related to MV-2's Snapchat account, I learned that MV-2's account was deleted on July 23, 2021, and that no other records existed.  This deletion date was during the period when MV-2 reported that she was communicating with **MIGLAVS**.  Despite this, information provided by MV-2 is reliable and credible to the extent that it is been corroborated by this investigation.  It is likely that MV-2 was using another Snapchat account not known to law enforcement to communicate with **MIGLAVS**.

**Page 17 – Affidavit of Clinton B. Lindsly**

50.     During my review of records related to MV-3's Snapchat account, I observed that MV-3's account was created on December 5, 2020.  During a review of media files, I saw that MV-3 sent many pictures depicting herself in various stages of undress to **MIGLAVS**.  None appeared to be nude or sexually explicit.  I also observed several photographs that **MIGLAVS** sent MV-3 of himself.  These photographs were not nude or sexually explicit.  I observed in one picture that **MIGLAVS** appeared to send MV-3 a screenshot of an Airbnb rental listing near her residence with a requested date during the first week of January 2023.

51.     I also reviewed messages between MV-3 and **MIGLAVS**.  The records provided by Snapchat spanned between approximately November 25, 2022, to February 20, 2023.  There were approximately 5,000 messages sent between MV-3 and **MIGLAVS**, most of which occurred in December 2022.  Numerous media files were sent between MV-3 and **MIGLAVS** that were not produced by Snapchat.  This is consistent with the media files being deleted and/or not saved by the user.

52.     The general nature of their conversation seemed to focus on being in love and discussion about their relationship.  Of note, I observed a message conversation on December 22, 2022, in which **MIGLAVS** asked MV-3 "Did you cum," consistent with having a sexually explicit video call.  There were also several messages where it appeared that **MIGLAVS** was aware of MV-3's age.  For example:

    a.  **MIGLAVS**: "Ur prolly not gonna wanna be with a 27 yr old when ur 18 /:"

    b.  **MIGLAVS**: "Age of consent in Washington is 16 right?"

    c.  **MIGLAVS**: "I wanna use u so bad when u turn 16 bbg [baby girl]"

**Page 18 – Affidavit of Clinton B. Lindsly**

53.    I also observed several instances where **MIGLAVS** continued to ask for more photos and confirmed that he had some photographs of MV-3 that appeared to be sexual in nature.  Here are several examples:

| January 6, 2023 | |
|---|---|
| **Sender** | **Message** |
| MV-3 | why didn't you answer |
| **MIGLAVS** | Cuz I was tryna Cum ðŸ˜ |
| MV-3 | still? |
| **MIGLAVS** | Yk when you love somebody everything else gets icky like you make me Cum so fast ðŸ¥² pls help ðŸ˜ |
| MV-3 | would you like some pics or vid hun |
| **MIGLAVS** | Yes please princess. Will you be a good girl for me? |
| MV-3 | yes daddy |
| **MIGLAVS** | Mmm |
| **MIGLAVS** | Iâ€™ve never seen the soapy one thatâ€™s new huh |

| December 4, 2022 | |
|---|---|
| **Sender** | **Message** |
| **MIGLAVS** | Youâ€™re so fine babyyy |
| **MIGLAVS** | Fuck baby I wanna see more now ðŸ˜ |
| **MIGLAVS** | Damn it I wanna cum to you now ðŸ™,, |
| MV-3 | you have all my good pics love |

**Page 19 – Affidavit of Clinton B. Lindsly**

| MIGLAVS | Mmmm I do huh |
|---------|---------------|
| MV-3 | mhm |
| MIGLAVS | Send more?ðŸ¥µ |
| MV-3 | i gotta get dressed |
| MIGLAVS | Lame ðŸ¤§ |
| MV-3 | i'm sorry |
| MIGLAVS | I think you should get undressed ðŸ˜®â€ ðŸ'¨ |

| *November 26, 2022* | |
|---------------------|---|
| **Sender** | **Message** |
| MIGLAVS | I wonâ€™t save anything |
| MIGLAVS | Fuck baby I already just cameðŸ˜«, Iâ€™ll show you tomorrow loveðŸ–¤ |
| MV-3 | Oki |
| MV-3 | would u like me to delete |
| MIGLAVS | ðŸ¥° |
| MIGLAVS | You donâ€™t have to if you donâ€™t want to |
| MV-3 | Okie |
| MV-3 | i'll leave them |
| MV-3 | i'm gonna go to bed |
| MV-3 | goodnight lovey |
| MV-3 | sleep well |

**Page 20 – Affidavit of Clinton B. Lindsly**

| MIGLAVS | Night bbg, you tooðŸ–¤ |
| **MIGLAVS** | ðŸ˜˜ðŸ˜˜ |
| **MIGLAVS** | Was that for me? Or.. |
| MV-3 | yes it was |
| **MIGLAVS** | I like it when you open wide for daddy |

*HSI Subpoenas **MIGLAVS'** Google Accounts and Identifies the **Subject Premises***

54.     Based on Snapchat records and as reported by MV-1, investigators learned that **MIGLAVS** used the following email addresses: michaelmiglavs@gmail.com, michaelmiglavs101@gmail.com, and miglavs.michael.pro@gmail.com.  The email miglavs.michael.pro@gmail.com had a recovery phone number of 971-380-0515 (the **Subject Cell Phone**).

55.     During a review of IP access logs for both michaelmiglavs@gmail.com and miglavs.michael.pro@gmail.com, I observed that starting in approximately the beginning of April 2023 both email accounts were accessed by IP address 50.53.199.49.[2]  According to open-source queries, this IP address is serviced by Ziply Fiber.

56.     Suspecting that **MIGLAVS** may have moved from his former residence based on information provided by MV-2 and the fact that there was a noticeable change in IP addresses being used to access two of his Gmail accounts, I served an administrative subpoena on Ziply Fiber for subscriber records.

---

[2] The email account michaelmiglavs101@gmail.com has not been accessed since January 2023.

**Page 21 – Affidavit of Clinton B. Lindsly**

57.     According to records obtained from Ziply Fiber, IP address 50.53.199.49 is subscribed to "Anthony Avila" at 20642 SW Sunde Ct, Tualatin, OR 97062 (**Subject Premises**).

*HSI Identifies Mega Accounts Linked to **MIGLAVS'** Email Accounts*

58.     In April 2023, I contacted Mega to identify if **MIGLAVS** had any cloud-based storage accounts related to the above three email addresses.  Based on my training and experience, I know that Mega is a cloud-based storage provider located in New Zealand that is commonly used by individuals involved in the collection and distribution of child pornography.  Accounts with Mega are uniquely identified by email address.  As such, no email address can have multiple accounts.  Mega provides basic subscriber records and other information in the course of their normal business pursuant to an official request.

59.     Mega reported accounts for the email addresses michaelmiglavs101@gmail.com and miglavs.michael.pro@gmail.com.  The account associated with miglavs.michael.pro@gmail.com currently contains approximately 917 files in 138 unique folders, which was approximately 0.52 gigabytes of data.  This account was created on November 28, 2022, and last accessed on March 23, 2023.  I observed that the account was accessed using an **iPhone 11**, which is similar to one of the devices that was accessing his Snapchat account.  This account was accessed from IP address 24.21.174.216 between November 28, 2022, and January 29, 2023.  That IP address is subscribed to **MIGLAVS** former residence.

*Investigators Obtain GPS Location Data from MIGLAVS' Cell Phone*

60.     On April 21, 2023, Magistrate Judge Youlee Yim You authorized a search warrant for real-time GPS location data from **MIGLAVS'** cell phone (**Subject Cell Phone** / 971-380-0515).  This warrant was assigned case number 23-MC-339.

**Page 22 – Affidavit of Clinton B. Lindsly**

61.    At approximately 4:00 p.m. that day, I started to receive GPS location data from the **Subject Cell Phone** in 15-minute intervals.  For the next four days, the **Subject Cell Phone** appeared to be primarily located in Tualatin near SW Avery Street and SW Boones Ferry Road with a margin of error of approximately 1,500 feet.  As I later learned, this is close in proximity to the **Subject Premises**.

62.    Ziply Fiber provided subscriber records for IP address 50.53.199.49, which was used to access two of **MIGLAVS'** email accounts starting in approximately April 2023.  The subscriber is Anthony Avila at 20642 SW Sunde Ct, Tualatin, OR 97062 (**Subject Premises**).  On April 24, 2023, I conducted surveillance at the **Subject Premises** and observed a second-floor rear window emitting a red hue or glow.  I recognized this hue from a social media post made by **MIGLAVS'** inside his suspected former residence bedroom.  I have provided a side-by-side photo comparison for the Court:



63.     On April 25, 2023, at approximately 7:33 a.m., I received GPS location data for the **Subject Cell Phone** that indicated that **MIGLAVS'** likely left the **Subject Premises**.  For the next several hours, the **Subject Cell Phone** appeared to in the Raleigh Hills area.

64.     At approximately 3:17 p.m., it appeared that the **Subject Cell Phone** was moving towards the general direction of the **Subject Premises**.  As such, investigators established surveillance at the **Subject Premises**.  The purpose of the surveillance was to visually observe **MIGLAVS'** enter the **Subject Premises**, consistent with him residing at the residence.

65.     At approximately 3:47 p.m., and according to Court authorized GPS location data, it appeared that the **Subject Cell Phone** was located at or near **MIGLAVS'** employer in Tualatin.

66.     At approximately 3:50 p.m., I established surveillance at **MIGLAVS'** employer.

67.     At approximately 3:57 p.m., I observed a silver Infiniti sedan depart the general area of **MIGLAVS'** employer.  I observed **MIGLAVS'** in the backseat and followed the car.

68.     At approximately 4:06 p.m., I observed the silver Infiniti pull next to the curb approximately one block away from the **Subject Premises**.  **MIGLAVS'** then exited the car and walked to the **Subject Premises**.  I observed **MIGLAVS'** appear to use a key to open the front door and enter the **Subject Premises**.  Shortly after **MIGLAVS** arrived at the **Subject Premises**, GPS location data confirmed that the **Subject Cell Phone** once again was the general area. Since it appears that **MIGLAVS** is now living aet the **Subject Premises**, I have probable cause to believe that evidence of the crimes of the **Target Offenses** will be found on **MIGLAVS'** person, on any digital devices found on **MIGLAVS'** person, and at his residence at the **Subject Premises**.

**Page 24 – Affidavit of Clinton B. Lindsly**

69.     The **Subject Premises** is described as a multi-dwelling residence that is at the end of the cul-de-sac on SW Sunde Ct.  The building is on the north side of the street and is brown with white trim.  The numbers "20642" can be seen on the west side of the front door in white lettering.  The front door to the **Subject Premises** faces south towards Sunde Ct.  I believe it is likely that **MIGLAVS** resides with roommates.  As such and as further described in Attachment A, the areas to be searched in the **Subject Premises** include **MIGLAVS'** bedroom, any storage areas to which he has access, and any shared common areas in the residence to which he has access.

70.     Based on the above investigation, I believe that **MIGLAVS** used various social media accounts, including Snapchat, to entice at least two minors online to produce sexually explicit content.  I also believe that **MIGLAVS** sent obscene matter to both minor victims over the internet.  As such, I believe that **MIGLAVS** committed the **Target Offenses** using multiple cell phones (i.e., **Subject Cell Phone**, an **iPhone XR**, and/or **iPhone 11**), an Xbox, and other devices that access the internet.  I know that Snapchat, Instagram, TikTok, Mega, and other social media applications can be accessed via either a smart phone or a computer.  Based on my training and experience, I know that individuals engaged in online chatting with one minor victim are usually engaged in online chats and/or attempts to meet with additional minor victims.

71.     Based on my training and experience, I know that when sexually explicit content is live streamed the suspect often records the event using a recording application on their phone or a different device.  The suspect does this so that they can revisit the sexually explicit content, so that they can share it with other users, and so they can add it to their "collection."  They may also use such recordings to blackmail victims into sending them additional sexually explicit material.  Additionally, as explained in more detail above, individuals with a sexual interest in

**Page 25 – Affidavit of Clinton B. Lindsly**

children frequently have multiple victims and collect and store images of child pornography that they may obtain through multiple sources. As such, I believe that it is likely that sexually explicit images and/or videos of MV-1, MV-2, MV-3, and/or other minor victims will likely be found on the **Subject Cell Phone** or on other digital data devices or storage media belonging to or used by **MIGLAVS**.

<u>**Search and Seizure of Digital Data**</u>

72.    This application seeks permission to search for and seize evidence of the crimes described above, including evidence of how computers, digital devices, and digital storage media were used, the purpose of their use, and who used them.

73.    Based on my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that data in digital form can be stored on a variety of systems and storage devices, including hard disk drives, floppy disks, compact disks, magnetic tapes, flash drives, and memory chips. Some of these devices can be smaller than a thumbnail and can take several forms, including thumb drives, secure digital media used in phones and cameras, personal music devices, and similar items.

74.    I know from my training and experience, as well as from information found in publicly available materials, that some digital devices offer their users the ability to unlock the device via the use of a fingerprint, thumbprint, or facial recognition in lieu of a numeric or alphanumeric passcode or password. These features are commonly referred to as biometric authentication and their availability is dependent on the model of the device as well as the operating system on the device. If a user enables biometric authentication on a digital device, he or she can register fingerprints, or their face, to unlock that device.

**Page 26 – Affidavit of Clinton B. Lindsly**

75.     In some circumstances, biometric authentication cannot be used to unlock a device, and a passcode or password must be used instead.  These circumstances include: (1) the device has been turned off or restarted; (2) the device has received a remote lock command; (3) too many unsuccessful attempts to unlock the device via biometric authentication are made; (4) too many hours have passed since the last time the device was unlocked; and (5) the device has not been unlocked via biometric authentication for a period of time and the passcode or password has not been entered for a certain amount of time.  Thus, in the event law enforcement encounters a locked digital device, the opportunity to unlock the device via biometric authentication exists only for a short time.

76.     The passcode or password that would unlock any devices at the **Subject Premises**, including an **iPhone XR** and **iPhone 11** as described above, is not known to law enforcement.  Thus, it is necessary to press **MIGLAVS's** fingers of to a suitably equipped device's sensor, or hold a suitably equipped device up to **MIGLAVS'** face, to unlock the device for the purpose of conducting the search authorized by this warrant.  Attempting to unlock the relevant device(s) via biometric authentication is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of conducting the search authorized by this warrant.  I therefore request that the Court authorize law enforcement officers to press **MIGLAVS's** fingers, including thumbs, to the fingerprint sensor of any phones or digital devices equipped with fingerprint authentication, or to hold a device equipped with facial recognition authentication up to **MIGLAVS'** face, to unlock the device and thereby allow investigators to search the contents as authorized by this warrant.

**Page 27 – Affidavit of Clinton B. Lindsly**

<u>**Removal of Data Storage Devices**</u>

77.    I know that a forensic image is an exact physical copy of a data storage device.  A forensic image captures all data on the subject media without viewing or changing the data in any way.  Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of data for information subject to seizure pursuant to the warrant.  I also know that during a search of premises it is not always possible to create a forensic image of or search digital devices or media for data for various reasons, including the following:

a.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  Because there are so many different types of digital devices and software in use today, it is difficult to anticipate all the necessary technical manuals, specialized equipment, and specific expertise necessary to conduct a thorough search of the media to ensure that the data will be preserved and evaluated in a useful manner.

b.    Searching digital devices can require the use of precise, scientific procedures designed to maintain the integrity of the evidence and to recover latent data not readily apparent to the casual user.  The recovery of such data may require the use of special software and procedures, such as those used in a law enforcement laboratory.

c.    The volume of data stored on many digital devices is typically so large that it is generally highly impractical to search for data during the execution of a physical search of premises.  Storage devices capable of storing 500 gigabytes to several terabytes of data are now commonplace in desktop computers.  It can take several hours, or even days, to image a single hard drive; the larger the drive, the longer it takes.  Depending upon the number and size of the devices, the length of time that agents must remain onsite to image and examine digital devices can make doing an on-site search impractical.

**Page 28 – Affidavit of Clinton B. Lindsly**

**Laboratory Setting May Be Essential for Complete and Accurate Analysis of Data**

78.     Since digital data may be vulnerable to inadvertent modification or destruction, a controlled environment, such as a law enforcement laboratory, may be essential to conduct a complete and accurate analysis of the digital devices from which the data will be extracted. Software used in a laboratory setting can often reveal the true nature of data. Therefore, a computer forensic reviewer needs a substantial amount of time to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or an instrumentality of a crime.

79.     Analyzing the contents of a computer or other electronic storage device, even without significant technical difficulties, can be very challenging, and a variety of search and analytical methods must be used. For example, searching by keywords, which is a limited text-based search, often yields thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process. The computer may have stored information about the data at issue which may not be searchable text, such as: who created it; when and how it was created, downloaded, or copied; when it was last accessed; when it was last modified; when it was last printed; and when it was deleted. The relevance of this kind of data is often contextual. Furthermore, many common email, database, and spreadsheet applications do not store data as searchable text, thereby necessitating additional search procedures. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed data requires a search of events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which users logged in, whether users shared passwords, whether a computer was connected to other computers or networks, and whether the

**Page 29 – Affidavit of Clinton B. Lindsly**

users accessed or used other programs or services during the relevant time period, can help

determine who was sitting at the keyboard.

80.     *Latent Data*:  Searching digital devices can require the use of precise scientific

procedures designed to maintain the integrity of the evidence and to recover latent data.  The

recovery of such data may require the use of special software and procedures.  Data that

represents electronic files or remnants of such files can be recovered months or even years after

it has been downloaded onto a hard drive, deleted, or viewed via the Internet.  Even when such

files have been deleted, they can be recovered months or years later using readily available

forensic tools.  Normally, when a person deletes a file on a computer, the data contained in the

file does not actually disappear; rather, that data remains on the hard drive until it is overwritten

by new data.  Therefore, deleted files, or remnants of deleted files, may reside in space on the

hard drive or other storage media that is not allocated to an active file.  In addition, a computer's

operating system may keep a record of deleted data in a swap or recovery file or in a program

specifically designed to restore the computer's settings in the event of a system failure.

81.     *Contextual Data*:

        a.      In some instances, the computer "writes" to storage media without the

specific knowledge or permission of the user.  Generally, data or files that have been received via

the Internet are automatically downloaded into a temporary Internet directory or cache.  The

browser typically maintains a fixed amount of hard drive space devoted to such data or files, and

the files are only overwritten as they are replaced with more recently viewed Internet pages.

Thus, the ability to retrieve artifacts of electronic activity from a hard drive depends less on

when the file was downloaded or viewed than on a particular user's operating system, storage

capacity, and computer usage.  Logs of access to websites, file management/transfer programs,

**Page 30 – Affidavit of Clinton B. Lindsly**

firewall permissions, and other data assist the examiner and investigators in creating a "picture" of what the computer was doing and how it was being used during the relevant time in question. Given the interrelationships of the data to various parts of the computer's operation, this information cannot be easily segregated.

        b.      Digital data on the hard drive that is not currently associated with any file may reveal evidence of a file that was once on the hard drive but has since been deleted or edited, or it could reveal a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, email programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations. Such data may also lead to exculpatory evidence.

        c.      Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be learned from the absence of data on a digital device. Specifically, the lack of computer security software, virus protection, malicious software, evidence of remote control by another computer system, or other programs or software, may assist in identifying the user indirectly and may provide evidence excluding other causes for the presence or absence of the items sought by this application. Additionally, since computer drives may store artifacts from the installation of software that is no longer active, evidence of the

**Page 31 – Affidavit of Clinton B. Lindsly**

historical presence of the kind of software and data described may have special significance in establishing timelines of usage, confirming the identification of certain users, establishing a point of reference for usage and, in some cases, assisting in the identification of certain users. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations. Such data may also lead to exculpatory evidence. Evidence of the absence of particular data on the drive is not generally capable of being segregated from the rest of the data on the drive.

### Search Procedure

82.     In searching for data capable of being read, stored, or interpreted by a computer or storage device, law enforcement personnel executing the search warrant will employ the following procedure:

a.     *On site search, if practicable.* Law enforcement officers trained in computer forensics (hereafter, "computer personnel"), if present, may be able to determine if digital devices can be searched on site in a reasonable amount of time and without jeopardizing the ability to preserve data on the devices. Any device searched on site will be seized only if it contains data falling within the list of items to be seized as set forth in the warrant and in Attachment B.

b.     *On site imaging, if practicable.* If a digital device cannot be searched on site as described above, the computer personnel, if present, will determine whether the device can be imaged on site in a reasonable amount of time without jeopardizing the ability to preserve the data.

c.     *Seizure of digital devices for off-site imaging and search.* If no computer personnel are present at the execution of the search warrant, or if computer personnel that are on-

**Page 32 – Affidavit of Clinton B. Lindsly**

site determine that a digital device cannot be searched or imaged on site in a reasonable amount

of time and without jeopardizing the ability to preserve data, the digital device will be seized and

transported to an appropriate law enforcement laboratory for review.

       d.      Law enforcement personnel will examine the digital device to extract and

seize any data that falls within the list of items to be seized as set forth in the warrant and in

Attachment B.  To the extent they discover data that falls outside the scope of the warrant that

they believe should be seized (e.g., contraband or evidence of other crimes), they will seek an

additional warrant.

       e.      Law enforcement personnel will use procedures designed to identify items

to be seized under the warrant.  These procedures may include the use of a "hash value" library

to exclude normal operating system files that do not need to be searched.  In addition, law

enforcement personnel may search for and attempt to recover deleted, hidden, or encrypted data

to determine whether the data falls within the list of items to be seized under the warrant.

       f.      If the digital device was seized or imaged, law enforcement personnel will

perform an initial search of the original digital device or image within a reasonable amount of

time not to exceed 120 days from the date the warrant was executed.  If, after conducting the

initial search, law enforcement personnel determine that an original digital device contains any

data falling within the list of items to be seized pursuant to the warrant, the government will

retain the original digital device to, among other things, litigate the admissibility/authenticity of

the seized items at trial, ensure the integrity of the copies, ensure the adequacy of chain of

custody, and resolve any issues regarding contamination of the evidence.  If the government

needs additional time to determine whether an original digital device or image contains any data

falling within the list of items to be seized pursuant to this warrant, it may seek an extension of

**Page 33 – Affidavit of Clinton B. Lindsly**

time from the Court within the original 120-day period from the date the warrant was executed. The government shall complete the search of the digital device or image within 180 days of the date the warrant was executed. If the government needs additional time to complete the search, it may seek an extension of time from the Court.

g.      If, at the conclusion of the search, law enforcement personnel determine that specific files or file folders on an original digital device or image do not contain any data that fall within the list of items to be seized pursuant to the warrant, they will not search or examine those files or folders further without authorization from the Court. Law enforcement personnel may continue to examine files or data falling within the list of items to be seized pursuant to the warrant, as well as data within the operating system, file system, or software application relating or pertaining to files or data falling within the list of items to be seized pursuant to the warrant (such as log files, registry data, and the like), through the conclusion of the case.

h.      If an original digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will return that original data device to its owner within a reasonable time following the search of that original data device and will seal any image of the device, absent further authorization from the Court.

## Items to be Seized

83.      To search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize, image, copy, and/or search the following items, subject to the procedures set forth herein:

**Page 34 – Affidavit of Clinton B. Lindsly**

      a.      Any computer equipment or digital devices that are capable of being used to commit or further the crimes outlined above, or to create, access, or store the types of contraband and evidence, fruits, or instrumentalities of such crimes, as set forth in Attachment B;

      b.      Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes outlined above, or to create, access, process, or store the types of contraband and evidence, fruits, or instrumentalities of such crimes, as set forth in Attachment B;

      c.      Any magnetic, electronic, or optical storage device capable of storing data, such as thumb drives and other USB data storage devices, floppy disks, hard disks, tapes, CD ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, iPods, and cell phones capable of being used to commit or further the crimes outlined above, or to create, access, or store the types of contraband and evidence, fruits, or instrumentalities of such crimes, as set forth in Attachment B;

      d.      Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software;

      e.      Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

      f.      Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the computer equipment, storage devices, or data, and any

**Page 35 – Affidavit of Clinton B. Lindsly**

passwords, password files, test keys, encryption codes, or other information necessary to access

the computer equipment, storage devices, or data; and

    g.  All records, documents, programs, applications, or materials created,

modified, or stored in any form, including in digital form, on any computer or digital device, that

show the actual user(s) of the computers or digital devices during any time period in which the

device was used to upload, download, store, receive, possess, or view child pornography,

including the web browser's history; temporary Internet files; cookies, bookmarked or favorite

web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol

addresses used by the computer; email, instant messages, and other electronic communications;

address books; contact lists; records of social networking and online service usage; and software

that would allow others to control the digital device such as viruses, Trojan horses, and other

forms of malicious software.

## Retention of Image

84.  The government will retain a forensic image of each electronic storage device

subjected to analysis for a number of reasons, including proving the authenticity of evidence to

be used at trial; responding to questions regarding the corruption of data; establishing the chain

of custody of data; refuting claims of fabricating, tampering with, or destroying data; and

addressing potential exculpatory evidence claims where, for example, a defendant claims that the

government avoided its obligations by destroying data or returning it to a third party.

## Inventory and Return

85.  With respect to the seizure of electronic storage media or the seizure or imaging

of electronically stored information, the search warrant return to the Court will describe the

physical storage media that were seized or imaged.

**Page 36 – Affidavit of Clinton B. Lindsly**

86.    The government has made no prior effort in any judicial forum to obtain the materials sought in this requested warrant.

### Request for Sealing

87.    I request that the Court issue an order sealing, until further order of the Court, all papers submitted in support of the requested search warrants, including the application, this affidavit, the attachments, and the requested search warrants.  I believe that sealing these documents is necessary because the information to be seized is relevant to an ongoing investigation, and any disclosure of the information at this time may cause flight from prosecution, destruction of or tampering of evidence, or could otherwise seriously jeopardize an investigation.  Premature disclosure of the contents of the application, this affidavit, the attachments, and the requested search warrants may adversely affect the integrity of the investigation.

### Conclusion

88.    Based on the foregoing, I have probable cause to believe that **Michael Ryan MIGLAVS** committed violations of *18 U.S.C. § 1470* – Transfer of Obscene Material to a Minor, *18 U.S.C § 2251(a)* – Sexual Exploitation of Children, and *18 U.S.C § 2422(b)* – Coercion and Enticement of a Minor, and that contraband and evidence, fruits, and instrumentalities of those violations, as described in Attachment B, will be located on **MIGLAVS'** person (including any devices found on his person) and the **Subject Premises**, as described in Attachments A.  I therefore respectfully request that the Court issue a warrant authorizing searches of **MIGLAVS'** person and the **Subject Premises** as described in Attachment A, for the items listed in Attachment B, and authorizing the examination and seizure of any such items found.

 **Page 37 – Affidavit of Clinton B. Lindsly**

89.     Prior to being submitted to the Court, this affidavit, the accompanying

application, and the requested search warrants were all reviewed by Assistant United States

Attorney Gary Sussman.  AUSA Sussman advised me that in his opinion, the affidavit and

application are legally and factually sufficient to establish probable cause to support the issuance

of the requested warrants.

<u>(By telephone)</u>
CLINTON LINDSLY
Special Agent
Homeland Security Investigations


Sworn to before me telephonically or by other reliable means pursuant to Fed. R. Crim.

P. 4.1 at _____11:06_____ am/pm on April ___27___, 2023.

HONORABLE STACIE F. BECKERMAN
United States Magistrate Judge

**Page 38 – Affidavit of Clinton B. Lindsly**